# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DEONTE WILLIAMS,
1804 Hawlings Park Ct
Brookeville, MD 20833
Phone: 240-541-0529

Plaintiff,

V.

PETE HEGSETH,
in his official capacity as Secretary of Defense, 1400 Defense Pentagon,
Washington, DC 20301;

And

DEPARTMENT OF DEFENSE A/K/A DEPARTMENT OF WAR
1400 Defense Pentagon
Washington, DC 20301;

And

DEPARTMENT OF DEFENSE OFFICE OF INSPECTOR GENERAL
4800 Mark Center Drive
Alexandria, VA 22350;

And

DEFENSE HEALTH AGENCY
7700 Arlington Blvd, Suite 5101
Falls Church, VA 22042;

And

DEFENSE HEALTH AGENCY OFFICE OF INSPECTOR GENERAL
7700 Arlington Blvd, Suite 5101
Falls Church, VA 22042

Case: 1:26–cv–03637 JURY DEMAND
Assigned To : Contreras, Rudolph
Assign. Date : 10/15/2026
Description: Pro Se Gen. Civ. (F–DECK)

CIVIL ACTION NO.:____________

RECEIVED
OCT 15 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Defendants )

# COMPLAINT

The Plaintiff, Deonte Williams (Dr. Williams hereafter), files this Complaint against the defendants, alleging as follows:

## NATURE OF ACTION AND JURISDICTION

1. This is a civil action brought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, due to the Defendants' failures to act appropriately within their investigative capacity under the Military Whistleblower Reprisal Protection Act (MWPA), 10 U.S.C. § 1034, in addition to deprivation of Dr. Williams' constitutional rights to Free Speech and Due Process, and a disregard for procedures required by law.
2. Dr. Williams seeks principally: (1) declaratory relief; (2) vacatur of the unlawful final agency actions; (3) remand for processing consistent with governing law; (4) retention of jurisdiction to ensure that any remand is completed in accordance with the Court's judgment; (5) non-monetary relief under the APA to compel lawful management of future investigatory action while enjoining the continued reliance on false or misleading record positions; and (6) any other appropriate relief the Court sees fit in ruling.
3. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which grants district courts jurisdiction over claims arising under the Constitution, federal laws, or treaties of the United States.
4. The APA permits judicial review of final agency decisions by which an individual is adversely affected or aggrieved. 5 U.S.C. §§ 702, 704. Final agency action is defined as

the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or an agency's failure to act. 5 U.S.C. § 551(13). The defendant's conduct constitutes final agency action under 5 U.S.C. § 704, as to which Dr. Williams has additionally exhausted all available administrative remedies and has no other adequate remedy in a court.

5. The defendant's final actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A).
6. The declaratory relief requested herein is proper under 5 U.S.C. §§ 706(1)-(2).
7. Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies/officers of the United States and this is the judicial district where one of the defendants is located. Defendants additionally maintain official headquarters and decision-making authority within the District of Columbia

## THE PARTIES

8. Plaintiff is a former United States Air Force (USAF) psychologist who was the victim of reprisal after making protected communications to the Defense Health Agency Office of Inspector General following the discovery of military medical violations during his active-duty tenure.
9. Defendant Pete Hegseth is sued in his official capacity as Secretary of Defense and is responsible for overall Department of Defense (DoD) policy, component oversight, and lawful administration of DoD functions, including general supervision of the DoD Office of the Inspector General. As a member of the President's Cabinet, Secretary Hegseth regularly performs his official duties within the District of Columbia.

10. The Department of Defense (DoD) is an executive department of the United States Government established under Title 10 of the United States Code, responsible for providing the military forces needed to deter war and protect the security of the United States. The DoD exercises authority, direction, and control over the executive military departments, the Armed Forces, and various defense agencies, including the Defense Health Agency. The DoD is a federal government agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1), and 5 U.S.C. § 701(b)(1).

11. The DoD Office of Inspector General (DoDIG) is a component of the DoD and is headquartered in Alexandria, Virginia with offices in Washington, District of Columbia. The DoDIG is considered an agency within the meaning of 5 U.S.C. § 551(1) and 5 U.S.C. § 701(b)(1). At all times relevant to this action, the DoDIG provided oversight regarding all relevant investigatory procedures, processes, and final outcome actions related to Dr. Williams' protected communications.

12. The Defense Health Agency (DHA) is a joint, integrated Combat Support Agency of the DoD that enables the Army, Navy, and Air Force medical services to provide a medically ready force to Combatant Commands in both peacetime and wartime. Headquartered in Falls Church, Virginia, the DHA administers the TRICARE health plan, manages the Military Health System (MHS) enterprise, and oversees the operation of military medical treatment facilities worldwide. The DHA is considered an agency within the meaning of 5 U.S.C. § 551(1) and 5 U.S.C. § 701(b)(1). The DHA issued the final action against Dr. Williams (in his civilian capacity), permanently revoking his military medical credentials and entering a derogatory report into the civilian National Practitioner Data Bank (NPDB).

13. The Defense Health Agency Office of the Inspector General (DHAIG) is a federal agency and oversight office that handles complaints, patient care concerns, fraud, waste, abuse, and healthcare policy enforcement within military medical treatment facilities. This agency additionally handles military whistleblower reprisal cases originating from the military medical treatment environments. The DHAIG is considered an agency within the meaning of 5 U.S.C. § 551(1) and 5 U.S.C. § 701(b)(1). The DHAIG led the reprisal investigation that ultimately concluded with the substantiation of military reprisal against Dr. Williams following his earliest protected communications. However, the DHAIG is also responsible for arbitrarily truncating Dr. Williams' reprisal investigation, omitting all reported personnel actions taking place beyond October 2023.

## INTRODUCTION

14. For decades, the DoD medical enterprise has faced tremendous scrutiny for problems within the mental health system across the service branches. These problems include punitive administrative discharges based on false mental health diagnoses to avoid awarding medical benefits to members in need. Furthermore, medical treatment facilities within the DoD have faced concerns with predatory provider misconduct with patients, clinical malfeasance to avoid transparent accountability, and many forms of fraud, waste, and abuse due to limited conduct oversight. These problems span a range of institutional and procedural issues, painting the picture of widespread systemic failure, to the detriment of any active-duty member courageous enough to seek treatment.

15. The Defense Health Agency (DHA) oversees the delivery and administration of military medicine, including mental healthcare, throughout the DoD. Within the DHA exists the

DHAIG, which plays a vital role in providing independent oversight, accountability, and systemic improvements throughout military healthcare when problems are exposed.

16. Problems are often exposed by DoD employees who come forward as whistleblowers, identifying wrongdoing, violations of the law, professional misconduct, fraud, waste, abuse, and safety concerns within the military and associated defense agencies. A DoD employee begins the whistleblowing process by filing a complaint through official protected channels, and the complaint is then triaged by the DoDIG before being processed for further action. Moreover, the DoDIG maintains strict safeguards for whistleblowers, protecting them from retaliation, reprisal, and restriction after they have made the brave decision to come forward. The established safeguards often lead to reprisal investigations developing alongside initial whistleblower complaints, frequently due to the aggressive adversarial response of members in leadership positions after they have discovered internal dissent. Nonetheless, the DoDIG broadly oversees investigative proceedings over circumstances that fall within this scope.

17. After receiving a complaint, the DoDIG follows a standardized initial review and evaluation process to determine the appropriate course of action. The initial review then consists of two phases; categorization and action determination. The categorization phase involves sorting the complaint based on severity, credibility, and subject matter. The action determination phase involves making the decision to initiate a direct investigation, conduct an audit, or to refer the complaint to the appropriate military service component or defense agency inspector general for adjudication.

18. In the case of a medical or mental health DoDIG complaint, such a case would be referred to the DHAIG following the action determination phase, if the DoDIG deems the

complaint credible and warranting investigative follow-up. After receiving the referral, the DHAIG follows a standardized intake and assessment process to determine jurisdiction, substance of the allegation(s), and the severity and risk involved with the complaint. If the complaint is deemed credible, within jurisdiction, and involving a significant violation of law, policy, and/or public trust, the DHAIG opens a case and initiates a formal investigation. As with the DoDIG, the DHAIG is supposed to maintain similar protections and safeguards for whistleblowers in this context, as issues with retaliation, reprisal, and restriction become relevant for the reasons mentioned supra ¶ 16.

19. Furthermore, the DHAIG is also beholden to strict procedural obligations while conducting both administrative whistleblower and whistleblower reprisal investigations, ensuring that credible claims are adjudicated accordingly with haste and fidelity.

## FACTUAL BACKGROUND

### Initial Complaints and Early Reprisal Action

20. Dr. Williams commissioned in the USAF in June 2020. In August 2021, he was assigned to Aviano Air Base (AB) in Aviano, Italy, where he served in the mental health flight within the 31st Medical Group (31 MDG) of the 31st Fighter Wing (31 FW). The mental health flight is led by a flight commander (usually a psychologist), who presides over the flight and all its elements. In total, the mental flight consists of three elements, the Mental Health Clinic, the Alcohol and Drug Abuse Prevention and Treatment (ADAPT) clinic, and the Family Advocacy Program (FAP).[1] Dr. Williams was initially assigned as a staff psychologist within the mental health flight. He served subordinate to a flight

[1] The Family Advocacy Program works to prevent, identify, and treat domestic violence, child abuse, and neglect within the military community. As the FAO, Dr. Williams was the lead officer for this program at Aviano Air Base. Of note, it is rare/unique for a junior officer to be given this important leadership position so early in their career.

commander, who acted as his direct supervisor and primary command authority within the flight.

21. Dr. Williams performed well in his role and was quickly given additional leadership responsibility on base. In November 2021, he was made the Family Advocacy Officer (FAO) of FAP. While acting as the FAO, he maintained all duties and patient care responsibilities within the mental health clinic, while taking on additional leadership duties in his new position. Similarly, he remained beholden to the flight's leadership structure, answering to the mental health flight commander as his superior officer.

22. Beginning in the spring of 2022, after reviewing clinic records and the Air Force Instruction (AFI),[2] Dr. Williams identified a pattern of historical regulatory malfeasance within FAP. He alerted the flight commander, Maj Amanda Kruszewski, of his findings and spent the remainder of 2022 working to return the program to compliance.

23. Toward the end of 2022, he began to uncover similar patterns of longstanding regulatory malfeasance within the mental health flight as whole. However, when Dr. Williams attempted to alert Maj Kruszewski (much like he had done within his own FAP clinic) he was met with a hostile response. Maj Kruszewski appeared to be offended by the mere idea that her flight would fall outside of regulatory compliance. She responded with command intimidation, threats, and other forms of bullying in her efforts to silence Dr. Williams and conceal his discoveries.

24. On or about January 3, 2023, during a mental health flight staff meeting, Dr. Williams attempted to raise some of his concerns openly to the flight, as many of his discoveries involved patient safety concerns. His report in this meeting led to an additional meeting

[2] Official legally binding order or rule book published by the military.

on or about January 5, 2023, involving only members of senior leadership (including Maj Kruszewski). During this meeting, Maj Kruszewski repeatedly shouted at Dr. Williams, disparaging him and attempting to discredit the concerns he had been raising to flight leadership.

25. On or about January 6, 2023, Dr. Williams filed a formal Equal Opportunity (EO) complaint with the 31st Fighter Wing Equal Opportunity Office (31 FW/EO) for bullying and the creation of a hostile work environment by command leadership.

26. Additionally, on or about January 9, 2023, Dr. Williams filed a separate formal complaint with the 31st Fighter Wing Office of Inspector General (31 FW/IG). In this complaint Dr. Williams reported that Maj Kruszewski had abused her command authority, created a hostile work environment, and disregarded clinical practices meant to ensure patient safety. Due to the dual nature of the allegations (i.e., both command oriented and medical), 31 FW/IG split the complaint into separate investigations.

27. The 31 FW/IG oversaw the abuse of authority and hostile work environment complaint, while they referred the patient safety concerns to the DHAIG (Mary Kate Edelen) for investigation.

28. On or about February 7, 2023, DoDIG personnel visited the mental health flight as a part of a separate previously scheduled Unit Effectiveness Inspection (UEI).[3] During this inspection, DoDIG inspectors were scheduled to meet with Dr. Williams independently. However, Maj Kruszewski insisted that she be present as well. During the meeting, Dr. Williams relayed several patient safety concerns and regulatory violations to the inspectors, much like he had done with his command personnel in the months prior. The

[3] This UEI was independent, unit wide, and unrelated to Dr. Williams' early reports to 31 FW/IG.

very next day, senior leadership notified Dr. Williams of specific orders to meet with his squadron commander, Lt Col Jennifer Hardos,[4] to discuss the UEI meeting.

29. Dr. Williams met with Lt Col Hardos on or about February 9, 2023, and was subsequently terminated from his leadership position as FAO without appropriate explanation. He was also given disciplinary documentation citing behaviors of command insubordination.

30. Dr. Williams filed a military whistleblower reprisal complaint with the 31 FW/IG following the disciplinary action and command removal from his leadership position on or about February 9, 2023.

31. On or about the same week, 31 FW/IG consolidated the military whistleblower reprisal complaint with the previous abuse of authority complaints targeted at several members within the 31 MDG chain of command. Then, against all logic, the 31 FW/IG referred all aspects of the abuse of authority element to the 31 MDG commander (31 MDG/CC), Col Jeffrey Fewell, for investigation and adjudication. Although the original complaints were centered on the hostile work environment created by senior leadership within the 31 MDG, 31 FW/IG ignored the obvious conflict of interest, as they handed adjudicatory authority back to the 31 MDG/CC. The DHAIG followed suit, referring the previous complaints regarding patient safety concerns to Col Fewell as well. This will be a pattern in the context of this complaint.

32. On or about March 2023, 31 FW/IG transferred the military whistleblower reprisal component of the case to the DHAIG for investigation. Following this transfer, the posture of the multiple IG investigations continued as follows:

[4] Lt Col Hardos was Maj Kruszewski's superior and direct first line supervisor in the chain of command.

a. 31 MDG patient safety complaints about the 31 MDG were referred to the 31 MDG/CC, Col Fewell, for adjudication.

b. 31 MDG abuse of authority complaints were also referred to Col Fewell for adjudication.

c. 31 MDG reprisal complaint referred to the DHAIG, with their senior reprisal investigator (Anna Cortes) continuing to oversee the whistleblower complaint.

33. The IG investigations continued concurrently alongside the EO investigation, involving many of the same investigatory subjects, and substantially overlapping in content.

**Case Mismanagement**

34. When Dr. Williams submitted the 31 MDG patient safety complaints, he provided a detailed account of several layers of clinical and ethical malfeasance taking place within the mental health flight. However, after receiving adjudicatory authority in investigating these particular complaints, Col Fewell elected to completely drop all claims against the mental health flight. He instead chose to direct the investigation entirely at Dr. Williams, his Family Advocacy Program, and his performance as the FAO.

35. On or about March 2023, Col Fewell requested the U.S. Air Forces in Europe – United Kingdom (USAFE-UK) conduct a Staff Assistance Visit (SAV), only assessing FAP for the period of August 2022 to February 2023 (Ex. 6). Throughout 2022, Dr. Williams had spent countless hours getting FAP into a state of regulatory compliance, a transparent fact that was widely known within the chain of command at the time. Naturally, for this reason, the SAV yielded zero findings of regulatory noncompliance within FAP (Ex. 9).

36. In choosing to direct the SAV to assess FAP at this particular time, Col Fewell was able to give the appearance of taking the original patient safety complaints seriously, while

ensuring that there would be zero findings to report back to the IG. Thus, protecting the conduct of senior officers within the 31 MDG while only placing the lens of scrutiny over Dr. Williams and his program.

37. On or about June 2023, Col Fewell used the net zero findings from the SAV visit as his primary rationale for the unsubstantiation of all IG complaints referred to him at that time, including the several dropped complaints related to senior officer abuse of authority and clinical/ethical malfeasance within the mental health flight as a whole. Most, if not all, of the original allegations went unaddressed in Col Fewell's final disposition document (Ex. 7; Ex. 9).

38. On or about November 2, 2023, Dr. Williams notified both 31 FW/IG and DHAIG of his concerns that Col Fewell abused his investigative authority as the commander in charge of several components of the IG complaints (Ex. 12-13). Dr. Williams highlighted the clear conflict of interest with assigning a series of IG complaints to a commander for adjudication, when said commander had already been named as an accessory to misconduct and/or as an investigative subject in several protected communications with EO and IG personnel. Moreover, Dr. Williams specifically reported that he believed that Col Fewell's willful mishandling of his IG complaints was a contributory factor in ongoing retaliatory conduct following his earlier complaints in 2023.

39. On or about November 17, 2023, Dr. Williams made further disclosures to DHAIG. He provided audio recordings of senior officers within the 31 MDG chain of command, corroborating his earlier reports of regulatory patient care malfeasance (Ex. 22). In particular, Dr. Williams highlighted that 31 MDG command personnel were disseminating information that directly contradicted Col Fewell's final disposition as it

related to the patient safety issues identified in Dr. Williams' IG complaint. Dr. Williams additionally highlights concerns with Col Fewell's impartiality as reviewing authority, given that at the time of investigating Dr. Williams' reported patient safety concerns, he was already a subject of investigation.

40. The EO investigation running concurrent with the IG investigations concluded around the same time as Col Fewell's final disposition. On or about May 2, 2023, several of Dr. Williams' original bullying and hostile work environment allegations against senior officers within the 31 MDG were substantiated by the 31 FW/EO.

41. The EO disposition was then meant to be referred to the 31st Fighter Wing Judge Advocate (31 FW/JA) for review, before being sent to the appropriate command personnel for final disposition. Due to the glaring conflict of interest within the 31 MDG/CC structure (given the concurrent IG investigations taking place), 31 FW/EO elected to assign the command role in this context to Col Fewell's direct supervisor, 31st Fighter Wing Commander (31 FW/CC) Brig Gen Tad Clark (Ex. 11).

42. Procedurally, when the 31 FW/EO substantiates a complaint, 31 FW/EO sends their complaint disposition to the 31 FW/JA for review and recommendation, prior to sending both dispositions to the commander for final review. However, this did not happen in this case. Instead, 31 FW/JA bypassed their own review, and elected to meet with Brig Gen Clark to come to a joint decision, overturning the substantiated complaint against the great weight of evidence noted in the 31 FW/EO clarification report (Ex. 10). This procedural deviation removed the capacity for impartiality in decision making for both the 31 FW/JA and the 31 FW/CC.

43. On or about June 20, 2023, Dr. Williams reported concerns to the DoDIG that the EO case was overturned against the great weight of evidence in favor of substantiation (Ex. 14). Dr. Williams also reported concerns with the procedural deviations that impacted the outcome of the case.

44. On or about December 19, 2024, the DoDIG maintained that the actions alleged in the EO complaint "did not rise to the level of discrimination or harassment" necessary for substantiation. Of note, both the EO case and the IG reprisal case involved the same parties within the same chain of command and the mental health flight. Similarly, there was a great deal of crossover amongst the allegations in each case, and the bar for reprisal (IG) is far higher than that of bullying (EO). Yet, the DHAIG substantiated reprisal in December 2025 (Ex. 6).

## Escalating Retaliation

45. Despite the ongoing investigations, 31 MDG senior leadership continued to take retaliatory action against Dr. Williams in an effort to discredit his testimony and discourage future whistleblowing.

46. Throughout March and April of 2023, Dr. Williams was assessed several forms of retaliatory documentation, primarily citing insubordination (without evidence), as the 31 MDG attempted to build a disciplinary paper trail for future processing of an involuntary discharge.

47. Retaliatory action continued to escalate in the final weeks of April 2023. Without any supporting evidence, Maj Kruszewski alleged to command (Col Fewell and Lt Col Hardos) that Dr. Williams had been demonstrating psychotic symptoms (delusions), and that his presence at work was causing her to fear for her safety.

48. On or about April 21, 2023, during a staff meeting, Kruszewski further alleged that Dr. Williams' conduct was growing increasingly belligerent, aggressive, and disrespectful. Of note, there is audio recording of this particular meeting in its entirety, and it directly contradicts Maj Kruszewski's allegation.

49. On or about the same day, in a concerted effort to validate these patently false and fabricated allegations against Dr. Williams, two other members of the mental health flight (Dr. Patricia Alexander and Maj Katherine Caujolle-Alls) simultaneously submitted corroborating statements to command, akin to Maj Kruszewski's report. Contextually, Dr. Alexander and Maj Caujolle-Alls had been previously named as subjects in the ongoing EO and IG investigations in the months prior, alongside Maj Kruszewski.

50. The following day, Maj Kruszewski and her husband, Joshua Kruszewski (Mr. Kruzewski) disturbingly alleged that Dr. Williams had invaded their home in the middle of the night (on or about Saturday, April 22, 2023) (Ex. 1-3). The Kruszewskis stated that Maj Kruszewski was not present during this alleged home invasion. Instead, Maj Kruszewski claimed that she was so terrified of Dr. Williams following his alleged behaviors in the work environment, that she no longer felt safe in her home (Ex. 1). Per her own testimony, she informed Col Fewell and Lt Col Hardos that she believed that Dr. Williams was "unpredictable and dangerous," and noted that she and her infant child had vacated their home for that weekend for safety.

51. Regarding the alleged home invasion, Mr. Kruszewski then alleged that after Maj Kruszewski and their child vacated their home, Dr. Williams "showed up" at their house in the late evening at 2:00 a.m., demanding to come inside. Mr. Kruszewski claimed he felt threatened by Dr. Williams' presence, and that Dr. Williams had "intent to harm." He

then asserted that after a brief scuffle, he was able to end the altercation, sending Dr. Williams away (Ex. 2). Maj Kruszewski corroborated this fabricated series of events (Ex. 15 at 8-11). Meanwhile, despite this allegation, the evidentiary record at the time clearly demonstrated that Dr. Williams had never been to the Kruszewski home, and that he in fact never left his own residence on the evening in question.

52. On or about Monday morning, April 24, 2023, Dr. Williams was blindsided by an order to meet with command (Col Fewell and Lt Col Hardos) at the start of the duty day. During this meeting, Dr. Williams was informed that command was initiating a no-contact order with all 31 MDG personnel and that he was to be ordered to complete a command directed mental health evaluation (CDE). When Dr. Williams inquired as to why, Lt Col Hardos noted that she did not have to inform him of their reasons for doing so. Lt Col Hardos also gave Dr. Williams more retaliatory documentation, and instructed him that his new daily duty location would be his home residence.

53. Although command personnel declined to inform Dr. Williams as to why he was being isolated and forced into a CDE, the record indicates that the false allegation of home invasion and unsafe behaviors were the impetus behind each action (Ex. 3-5).

54. 31 MDG/CC never reported the Kruszewski allegations to local law enforcement/security forces, nor did command even as much as attempt an internal investigation to substantiate their absurd claims. Instead, 31 MDG/CC treated the allegations as fact, and proceeded forward with action against Dr. Williams

55. On or about April 24, 2023, 31 MDG/CC requested that the CDE be conducted in the United Kingdom at Lakenheath Air Base, by commander and clinical psychologist, Col David Dickey. Despite the availability of local options for impartial evaluation within

Italy, 31 MDG/CC elected to go the drastically more expensive route of sending Dr. Williams to the United Kingdom for assessment. 31 MDG/CC then explicitly noted that their rationale for ordering the CDE was because Dr. Williams "threw flight leadership under the bus" to IG personnel in the preceding months (Ex. 4-5). Furthermore, the CDE inquiry prior to the initiation of the evaluation included a direct and explicit request that Dr. Williams be diagnosed with a personality disorder, so that he may be processed for administrative separation.

56. After an uncharacteristically brief assessment, Dr. Dickey granted the wishes of the 31 MDG/CC, diagnosing Dr. Williams with a personality disorder and recommending his immediate administrative discharge from active-duty service.

57. Dr. Williams promptly alerted the DHAIG of these retaliatory incidents as they happened (Ex. 18-20). On or about August 7, 2023, he notified DHAIG of Maj Kruszewski and her husband's fabricated and wholly unsupported claims of home invasion. He also made DHAIG investigators aware of additional active-duty and civilian personnel who assisted in efforts to falsify information in corroboration with the Kruszewski allegations. Furthermore, he comprehensively explained how members in his chain of command were attempting to use the false allegations as the impetus for further derogatory action, including but not limited to administrative discharge (Ex. 20).

58. Of note, the DHAIG conspicuously omitted any mention of the Kruszewski allegations, the future personnel actions that they ignited, and/or Dr. Williams' additional reprisal complaint subjects from the final report produced following their investigation. Such omissions came despite explicitly acknowledging in that very report that Dr. Williams reported additional personnel actions between May and July of 2023 (Ex. 6 at 9).

59. Following the outcome of the CDE, 31 MDG/CC proceeded forward with an attempt at processing Dr. Williams for immediate discharge from service.

60. However, on or about July 2023, Brig Gen Clark intervened and halted all action related to discharge processing. He then requested an in-person meeting with Dr. Williams to discuss plans for a pathway forward.

61. On or about July 19, 2023, Dr. Williams met with Brig Gen Clark, alongside his area defense counsel (Maj Jacob Beeman) and the 31 FW/EO Director (Curtis Bradley). During this meeting, Brig Gen Clark was remorseful, expressing that he was sorry for what Dr. Williams had endured up until this point. He then informed Dr. Williams that he would be rescinding all disciplinary paperwork in his personnel information file (PIF), noting that it was inappropriate for Dr. Williams to have received disciplinary documentation in the first place. Brig Gen Clark also lifted the no-contact order noted supra ¶ 52. He then indicated that he would like to strike the CDE and its results from the record. However, he was unable to do so because he did not have authority to affect what had already been documented in a member's medical record.

62. On or about July 20, 2023, Dr. Williams, Brig Gen Clark, Maj Beeman, and Curtis Bradley met once more. During this meeting, Brig Gen Clark suggested Dr. Williams subject himself to another CDE, so that the second CDE would supersede the first. Clark believed it would be more impartial than the first, and he indicated that this would solve the issue of not being able to clear the first from the medical record. Dr. Williams declined this suggestion, noting that it was not an appropriate remedy. Dr. Williams explained that if the first CDE was retaliatory, it would make little sense to engage in a second when the first was not warranted. Both the July 19 and 20 meetings were cordial,

with Dr. Williams demonstrating appropriate respect and deference to Brig Gen Clark as his commander and superior officer. Additionally, there are audio recordings of both meetings for reference.

63. On or about August 7, 2023, Col Fewell ordered Dr. Williams to his office for a meeting. During this meeting Col Fewell reestablished another no-contact order between Dr. Williams, Maj Kruszewski, Mr. Kruszewski, and their infant child. Bewildered by this development, Dr. Williams inquired as to why another contact order was being established. Col Fewell explained that he believed Dr. Williams still posed a threat of violence to the Kruszewski family based on further allegations from Maj Kruszewski and her husband. Additionally, it was during this meeting that Dr. Williams first learned of the absurd extent of the Kruszewski home invasion allegations. In this and in future meetings, Dr. Williams inquired as to whether 31 MDG/CC would be investigating the merits of Kruszewski's baseless allegations, or referring them to law enforcement. In every instance, Col Fewell declined to investigate or refer such allegations to law enforcement. For reference, each of these meetings between Col Fewell and Dr. Williams were memorialized via audio recording.

64. On or about August 7, 2023, Dr. Williams notified DHAIG that Col Fewell had elected not to investigate the Kruszewski allegations in reprisal for Dr. Williams having named him in the both the EO and IG investigations. Dr. Williams similarly disseminated audio recordings to DHAIG of the meetings with Col Fewell as evidence.

65. Due to the no-contact order, Dr. Williams was not permitted to return to duty within the mental health flight, as Maj Kruszewski remained the mental health flight commander.

Without being able to return to the mental health flight, Dr. Williams was not permitted to see mental health patients within the requirements of his official duties.

66. Despite the 31 MDG/CC imposing the August 2023 no-contact order, Col Fewell identified Dr. Williams as an "impaired provider" based on his inability to return to the mental health flight. Furthermore, Col Fewell reasoned that Dr. Williams was still violent and dangerous based on the additional Kruszewski allegations, thus supporting a decision to keep Dr. Williams away from the mental health flight indefinitely. Moreover, Col Fewell identified the retaliatory personality disorder diagnosis as supporting rationale behind his designation of Dr. Williams as an "impaired provider."

67. On or about September 2023, Dr. Williams was involuntarily enrolled in the Impaired Health Provider Program (IHPP), using the rationale noted in ¶ 66.

68. On or about October 2023, members of the chain of command within the 31 MDG explicitly strategized about how they can use the IHPP and/or Quality Assurance Investigation (QAI) process to quickly discharge Dr. Williams from active-duty service (Ex. 26 at 242-51). Moreover, 31 MDG commanders appeared to express frustration about not having enough evidence to justify continued action against Dr. Williams. They also discussed ongoing efforts to bypass and avoid IG involvement as they sought back-channel options in the pursuit of Dr. Williams' discharge from service.

69. On or about October 18, 2023, 31 MDG commanders explicitly discussed how they may be able to effectuate derogatory action against Dr. Williams' civilian medical license in an effort to bypass Secretarial approval for a mental health based discharge from service (Ex. 26 at 248-49).

70. On or about December 11, 2023, 31 MDG/CC initiated a QAI against Dr. Williams (Ex. 27), seeking permanent suspension of his credentials as a military medical provider. Although Dr. Williams was already enrolled in the IHPP due to fictitious safety concerns regarding his alleged violent behavior (Ex. 30), 31 MDG/CC shifted the focus away from the false allegations of violence to initiate the QAI under an air of feigned investigative legitimacy (Ex. 27). In particular, the QAI initiation documents cited reports of disruptive behavior in a professional setting compromising effective unit cohesion, alleged inconsistencies in medical documentation, variance from organizational bylaws, and deviations from the established standard of care. Of note, these allegations were based on the retaliatory disciplinary documentation noted in ¶ 61, that had already been rescinded by Brig Gen Clark by this point. All relevant commanders and command personnel within the 31 MDG were aware that said documentation had been rescinded by Clark, yet the 31 MDG continued forward with a QAI based entirely on those documents and prior allegations of dangerous and/or violent behavior.

71. Capt Jason Ruggieri was assigned as the Quality Assurance Investigation Officer (QAIO) in charge of completing the investigation. He completed his investigation after a very brief inquiry, interviewing all investigatory personnel quickly between December 13-19, 2023 (Ex. 37).

72. The QAI was rife with concerning investigative practices that indicated both a complete indifference to objective facts and a clear bias against Dr. Williams. Despite Dr. Williams offering the QAIO several names of individuals to interview as collateral, the QAIO instead chose to selectively interview only those within the chain of command. Moreover,

each member interviewed was involved in some manner with both the EO and the IG investigations as either subjects of investigation or supporting parties to reprisal (Ex. 37).

73. The QAIO expressed that there were "no concerns for Maj Kruzewski's credibility as a historian," and took her testimony at face value, presenting her warped description of the events leading to the QAI as factual. In her sworn testimony, she stated that Dr. Williams was removed from the mental health flight, assessed a no-contact order, and mandated to attend a CDE, all due to the disciplinary documentation received in the months leading up to April 2023. Maj Kruszewski strategically omitted that she and her husband had conspired to report allegations of home invasion to substantiate claims that Dr. Williams was a safety risk to staff and patients alike. Although Dr. Williams gave sworn testimony and offered objective evidence of the Kruszewski allegations that later ignited the QAI, the QAIO similarly omitted any reference to those events and their impact in his final report.

74. The QAIO interviewed Dr. Williams and received his sworn testimony on or about December 15, 2023. During this interview, Dr. Williams explicitly explained the retaliatory circumstances leading up to and including the QAI proceedings. He thoroughly detailed his whistleblowing efforts earlier in the year, and the 31 MDG's command response in reprisal for his actions. He further explained the depth and impact of the Kruszewski allegations of home invasion, and the concerted effort of the 31 MDG/CC to use those allegations to initiate the QAI. He also informed the QAIO that the allegations were treated as credible/factual, without being provided the opportunity for due process. Dr. Williams additionally expressed overall concerns with the fidelity of the QAI proceedings, as several of the proceedings related to this case had been carried out in

bad faith. Yet, even so, Dr. Williams was respectful to the QAIO and cooperative throughout the QAI proceedings.

75. Following the QAIO's interview with Dr. Williams, the QAIO morphed the original QAI allegations, substantively altering them after the interview without providing notice to Dr. Williams ahead of the close of investigation (Ex. 37; Ex. 38). Specifically, the QAIO shifted the allegations from the vague allegations noted supra ¶ 70, tailoring them to more closely align with the testimonies he obtained from interviews with members of command. He then used post hoc rationalization to establish a case against Dr. Williams throughout the investigative process.

76. The QAIO interviewed Brig Gen Clark and received his sworn written testimony on or about December 18, 2023 (Ex. 35; Ex. 37). Clark's testimony was full of factual inconsistencies, as he reported that his previous direct encounters with Dr. Williams were negative. Specifically, Clark reported that during the July meetings mentioned supra ¶¶ 61-62, Dr. Williams allegedly demonstrated insubordinate and uncooperative behavior that led Clark to believe that he was unfit for continued military service (Ex. 35). This testimony came despite the record (i.e., the associated audio recording of each meeting) clearly demonstrating that the July meetings were cordial, with Clark explicitly stating support for Dr. Williams in the face of mistreatment by members of his command. Moreover, despite explicitly stating in the July meetings that he believed the CDE to have been improper and unwarranted, Clark altered his testimony during the QAI, stating that it was instead "valid and warranted" (Ex. 37).

77. After the July 2023 meetings, Dr. Williams and Brig Gen Clark did not have any direct in-person correspondence through the start of the QAI in December 2023 The only

difference between July and December 2023, was that Clark had been named a subject in the IG investigations during that time. He was additionally subject to a congressional inquiry related to Dr. Williams' case, by Congressman Jamie Raskin's office in October 2023 (Ex. 32). When responding to the congressional inquiry, Clark mischaracterized how 31 MDG/CC had been handling Dr. Williams throughout 2023. He omitted several key details regarding the Kruszewski allegations, and how they directly led to further derogatory action against Dr. Williams (i.e., the QAI). Clark additionally reported to Congressman Raskin that he would "wait for the results of the pending Inspector General and Equal Opportunity cases" while he "continue[d] to care" for Dr. Williams. However, he had already been working behind the scenes to support a QAI aimed at seeking Dr. Williams' administrative discharge far before the investigations were finished.

78. In just five short months, Clark went from supporting Dr. Williams and attempting to clear his name in July 2023, to testifying in his QAI sworn testimony that Dr. Williams was no longer fit for service. Dr. Williams had not exhibited any disciplinary concerns between July and December, nor had he directly engaged with Clark after the original two meetings in July. Bizarrely, the following month (January 2024), Clark then went on to recommend Dr. Williams for promotion in his grade and rank (Ex. 33), despite his own conflicting sworn testimony during the QAI in December.

79. Of note, the July meetings between Dr. Williams and Brig Gen Clark mentioned supra ¶¶ 61-62, were audio recorded in their entirety.

80. On or about December 13, 2023, Dr. Williams expressed concerns about the fidelity of the QAI to the DHAIG (Anna Cortes) (Ex. 36). Furthermore, on or about July 2024, Dr. Williams reported Brig Gen Clark's false statements under oath to the DoDIG (Ex. 42).[5]

81. On or about December 22, 2023, following a brief investigation, the QAIO substantiated all allegations against Dr. Williams and recommended the revocation of his privileges to practice military medicine. On or about January 9, 2024, the 31 MDG Credentials Committee concurred with the QAIO's findings, despite the QAIO changing the allegations midway through the investigation (Ex. 31).

82. On or about mid-December 2023, the DHAIG notified Dr. Williams that the office of the Secretary of the Air Force (SECAF) would be intervening, granting a hardship permanent change of station (PCS) due to the circumstances he had been facing while engaging with the 31 MDG. Dr. Williams was quickly scheduled to leave Italy as soon as possible, as he was assigned to Andrews Air Force Base (AFB) in Maryland. He was due to leave Italy on or about January 18, 2024. The SECAF did not notify command staff within the 31 MDG of this development. 31 MDG/CC discovered Dr. Williams would be leaving (against their wishes) on or about January 2024.

83. On or about January 17, 2024, the day before Dr. Williams was anticipated to depart Italy, Col Fewell elected to completely revoke Dr. Williams' clinical privileges to practice military medicine. By doing so prior to Dr. Williams departing, he ensured that the 31 MDG would maintain adjudicative control over his credentials despite his reassignment. This decision maintained derogatory action against Dr. Williams, making it so that he would not be able to engage in his standard duties upon arrival at Andrews

[5] Dr. Williams also made several earlier attempts to report Brig Gen Clark's conduct throughout 2023-2024.

AFB. Although now assigned to a different base entirely, in a completely different country, his capacity to do his job still remained in the grips of command officials at Aviano AB.

84. On or about February 13, 2024, Dr. Williams appealed by requesting a Peer Review Hearing Panel (PRHP) to contest the Col Fewell's revocation of his clinical privileges (Ex. 46).[6] Col Fewell granted the PRHP request and it was scheduled to be held in person in Italy on or about June 3, 2024. The 31 MDG planned to call several witnesses to testify during the hearing, in support of their previous allegations and rationale for maintaining the revocation of credentials. Witnesses were solely comprised of superior ranked officers within Dr. Williams' chain of command. Among the identified witnesses were Brig Gen Clark, Lt Col Hardos, Maj Kruszewski, Capt Ruggieri, and several other members of the command staff within the 31 MDG (Ex. 52).

85. On or about June 3, 2024, though now stationed in Maryland, Dr. Williams funded his own travel to return to Italy for the formal PRHP proceeding (Ex. 51-52). Shortly after his arrival, all but one adversarial witness identified by the 31 MDG refused to testify during the PRHP proceedings. Only Maj Kruszewski remained, and although present in Italy, she declined to do so in person.

86. The PRHP panel consisted of a panel chairperson, Maj Tiffany Chance (Flight Commander within the 31 MDG), and two panelists (Maj Lisa Baer and Capt Samuel

[6] A PRHP is a formal, evidentiary tribunal composed of a panel of fellow healthcare providers tasked with determining whether a provider's clinical privileges should be restricted, reduced, or completely revoked (permanently). It is the next step of appeal/redress following an unfavorable QAI decision. If the panel sustains an adverse action, that decision triggers a mandatory, career damaging report to the National Practitioner Data Bank (NPDB) and the provider's state licensing board.

Alex). The hearing was conducted in the command section of the 31 MDG, merely feet from the offices of Col Fewell and Lt Col Hardos.

87. During the hearing, the panelist reviewed four allegations stemming from the QAI. The allegations were documented as (1) disruptive behavior in a professional setting compromising effective unit cohesion, (2) inconsistencies in medical documentation, (3) variance from organizational bylaws, and (4) deviations from established standards of care. Importantly, allegation 1 stemmed directly from Maj Kruszewski's allegation that she was afraid of Dr. Williams due to her claims of his terrorizing presence and allegedly invading her home. This allegation was the impetus for removal from the clinic, and for the 31 MDG initiating the IHPP and QAI in the first place. Furthermore, the other three allegations were copied directly from the disciplinary documentation mentioned supra ¶ 61. The panel was aware that Brig Gen Clark had already rescinded said disciplinary documentation in the year prior, establishing the allegations as unwarranted. Yet, the panel proceeded with each allegation regardless (Ex. 47).

88. Although the 31 MDG contends that the hearing was conducted in a fair and unbiased manner (Ex. 51), it is significant to note that Maj Chance (panel chairperson) was an officer subordinate to Col Fewell at the time of the hearing. Moreover, despite the panel's awareness that the QAI/PRHP process was triggered by Maj Kruszewski's allegations (i.e., that Dr. Williams was dangerous due to his demeanor and alleged invasion of her home), the panelists refused to mention and/or address said allegations despite their clear influence on the hearing (Ex. 53). Additionally, the panel refused to acknowledge that the allegations were based on disciplinary documentation that had already been rescinded in 2023.

89. On or about August 14, 2024, the PRHP panel decided to unanimously substantiate allegations 2, 3, and 4 (Ex. 47; Ex. 62). Interestingly, the panel found allegation 1 unsubstantiated, noting that the perception that Dr. Williams was disruptive was "not widespread." Instead, it was "localized to individuals in [his] leadership/supervisory chain," and "did not have the potential to adversely affect the health or welfare of the patients" (Ex. 47). Overall, the PRHP recommended permanent revocation of Dr. Williams' military medical credentials.

90. On or about August 30, 2024, Dr. Williams' area defense counsel (ADC) issued a response to the PRHP verdict. In this response, the ADC highlighted that the PRHP and the allegations within were retaliatory in nature and that the final verdict represented an injustice to Dr. Williams following a bad faith investigation (Ex. 54-55).

91. On or about October 8, 2024, newly assigned 31 MDG/CC, Col Joshua Curtis,[7] reviewed the PRHP recommendation and concurred, despite the ongoing whistleblower retaliation investigation linked to all actions that led to the QAI and subsequent PRHP (Ex. 51).

92. On or about October 8, 2024, Dr. Williams notified the DHAIG of Col Curtis' decision and the final PRHP outcome that came as a result (Ex. 57-58).

93. On or about the fall of 2024, Dr. Williams was honorably discharged from the USAF, and he started law school at the University of Wisconsin-Madison.

94. On or about June 11, 2025, after higher level review, the DHA concurred with Col Curtis' findings and permanently revoked Dr. Williams' military medical credentials (Ex. 49). The DHA then subsequently reported all relevant derogatory action taken on Dr. Williams throughout the investigation to the National Practitioner Data Bank, Dr.

---

[7] Col Fewell was reassigned to a new military installation in the summer of 2024, Col Curtis assumed his position following his departure.

Williams' state of licensure, and any other agencies the DHA deemed appropriate (Ex. 48-49; Ex. 60).

95. Although now a civilian law student, the DHA's final action has had lasting legal and professional consequences for Dr. Williams even years after discharge (Ex. 56). Because the DHA acts as a federal credentialing entity, its final decision in this context permanently bars him from practicing in any military health system facility going forward. It similarly triggers mandatory reporting and potentially reciprocal investigations by state licensing boards, exposing Dr. Williams to future professional discipline, suspension, and/or loss of license to practice in any clinical setting. Furthermore, civilian healthcare employers, insurance panels, and hospital credentialing committees routinely query the NPDB when reviewing the professional history, clinical competence, and hiring capacity of prospective medical providers. A permanent derogatory report in the NPDB severely undermines Dr. Williams' future employability as a clinical psychologist, effectively threatening to end his civilian career as a treatment provider.

## Humanitarian Reassignment

96. On or about the spring of 2022, Dr. Williams' mother, Sharron Walker, was diagnosed with breast cancer. She promptly started chemotherapy to treat the progression of the disease. On or about March 2023, she completed treatment and formally entered remission.

97. On or about May 2023, after a brief period of remission, the cancer aggressively returned and his mother was hospitalized due to a collapsed lung. After she was stabilized, doctors informed her that the cancer had progressed to stage IV, and was now terminal.

98. On or about May 17, 2023, Dr. Williams was granted a humanitarian reassignment. He was reassigned to MacDill AFB (Florida), so that he may be with his mother in her final months. Once humanitarian orders are received, reassignment usually occurs rapidly due to the sensitive nature of the reassignment. However, Dr. Williams' orders were uncharacteristically delayed by two months.

99. On or about June 30, 2023, Dr. Williams' mother died in her sleep in Florida, while Dr. Williams remained in Italy awaiting reassignment.

100. On or about July 2023, following his mother's passing, Dr. Williams saw his orders to MacDill AFB canceled, and he was returned to Aviano AB.

101. On or about August 2023, he was instructed by 31 FW/CC that he would be remaining in Italy for the foreseeable future. This instruction came despite the fact that it is customary to allow active-duty members to PCS within a humanitarian assignment, even when their loved one has passed during the reassignment process.

102. On or about August 2023, Dr. Williams requested information from the Air Force Personnel Center (AFPC), regarding why his orders had been canceled. Yet, AFPC declined to offer a specific reason why his orders were terminated.

103. On or about July/August 2023, Brig Gen Clark informed Dr. Williams that his orders to MacDill AFB had been allegedly canceled for cause. Clark explained that someone from Aviano AB had unlawfully contacted the base commander at MacDill AFB, telling him that Dr. Williams had a personality disorder and that he was a problem officer who was soon to be discharged. The base commander at MacDill subsequently rejected his assignment, leading to the cancellation of his orders.

**<u>DHAIG Investigation: Substantiation of Whistleblower Reprisal</u>**

104. On or about December 9, 2025, the DHAIG substantiated whistleblower reprisal, in favor of Dr. Williams, against Maj Kruszewski and Lt Col Hardos (Ex. 6). Specifically, the DHAIG substantiated that Kruszewski and Hardos issued Dr. Williams disciplinary documentation, removed him from his FAP position as FAO, referred him for a command directed mental health evaluation, and sabotaged his humanitarian reassignment (leading to the uncharacteristic processing delay and eventual cancellation of his orders) in reprisal for his many protected communications, in violation of 10 U.S.C. § 1034 and DoDD 7050.06.

105. However, the associated IG report revealed several key omissions throughout the investigative process. First, the IG report blatantly excludes any mention of any reprisal subject other than Maj Kruszewski, Lt Col Hardos, and Col Fewell. This omission is puzzling, given that Dr. Williams made several direct disclosures to DHAIG investigative personnel, explicitly identifying many other subjects engaging in retaliatory behaviors. For example, several senior officials, including Brig Gen Clark, were named multiple times in the investigation. Yet, the IG report is conspicuously devoid of any reference to their retaliatory conduct. In fact, it makes no mention of their involvement whatsoever.

106. Furthermore, the IG report excludes substantive matter pertinent to additional personnel action. Although the investigation carried on from early 2023 to late 2025, the IG report inexplicably omits any reference to personnel actions sustained after October 2023. Among the blatant exclusions were the retaliatory QAI, Brig Gen Clark's false statements under oath, the retaliatory PRHP, the permanent revocation of Dr. Williams' clinical privileges, and the derogatory report that was filed in the civilian NPDB.

107. Additionally, the IG report omitted any reference to the Kruszewski allegations, and the 31 MDG's usage of such allegations to justify the QAI, the PRHP, and the eventual revocation of privileges.

108. Both the DoDIG and the DHAIG were made abundantly aware each of the omissions mentioned supra ¶¶ 105-107. Yet the final IG report arbitrarily omits each of these material factors from the final investigative documents (Ex. 42).

109. On or about December 13, 2025, Dr. Williams filed several DoDIG hotline complaints notifying the DoDIG of his concerns regarding the omissions within the DHA's final IG report (Ex. 67-69). Dr. Williams informed the DoDIG that the DHAIG arbitrarily omitted several key personnel actions in their whistleblower reprisal investigation, excluding blatant reprisal conduct carried out by several officers and senior officials.

110. Importantly, Dr. Williams did not raise new allegations that had gone unmentioned throughout 2023 and 2024. Instead, he requested answers explaining the omissions mentioned supra ¶¶ 105-107. He additionally requesting oversight due to the exclusion of everything in his reprisal case after October 2023, despite the clear presence of ongoing retaliatory conduct. He additionally reported the arbitrary omission of several subjects, despite their direct involvement in reprisal throughout 2023 and 2024.

111. Although the DHAIG substantiated reprisal as it relates to many behaviors of retaliatory conduct, their arbitrary omission of everything after October 2023 leaves Dr. Williams with many layers of derogatory personnel action remaining in his military record. However, more importantly, it leaves him with a final DHA action of a calumnious report in his civilian NPDB record, of which he has no remedy to address.

112. On or about December 19, 2025, the DoDIG referred the December 13th filings back to the DHAIG for review and adjudication (Ex. 61).

113. On or about June 8, 2026, the DHAIG tendered a response to the December 2025 inquiry (Ex. 61). In their response the DHAIG declined to investigate further. Against the great weight of evidence to the contrary, the DHAIG ruled that many of the claims raised were "untimely." They made this finding despite the objective record demonstrating that they were notified of each listed claim several times throughout 2023 and 2024. In doing so, the DHAIG effectively treated all claims as if they were being reviewed for the first time, despite having been notified of each in years prior.

114. Furthermore, other claims were dismissed as potential abuses of authority, outside the scope of a reprisal investigation. However, it should be noted that Dr. Williams did in fact submit several abuse of authority claims in addition to the reprisal claims from 2023-25. This detail was also explicitly noted and emphasized in the December 2025 submission mentioned supra ¶ 109. Yet, the DHAIG declined to mention this in their June 8th response.

115. Overall, the DHAIG's response continued the trend of omitting key details related to the many protected communications made by Dr. Williams beyond October 2023. In their response, they effectively segregate each claim as if they are not linked to a much larger reprisal investigation. The DHAIG isolated each allegation, completely detaching them from the continued personnel actions taking place in 2024-25. Such conduct misrepresented the facts of the case. Furthermore, their response blatantly disregarded the nexus between the reprisal conduct of several members of senior leadership and the ultimate DHA action taken as a result (i.e., the DHA's final report of all relevant

derogatory action taken on Dr. Williams to the NPDB, Dr. Williams' state of licensure, and any other agencies the DHA deemed relevant).

116. On or about the spring of 2026, Dr. Williams initiated a senatorial inquiry on this matter with the office of Senator Chris Van Hollen.

117. On or about the summer/fall of 2026, the DoDIG tendered several responses to Senator Van Hollen's office in reference to Dr. Williams' case and the DHAIG's final response. (Ex. 64-66). Throughout each response, the DoDIG proclaimed many (if not all) of the same misrepresentations and misstatements of fact adopted by the DHAIG in their final agency decision on June 8th.

118. On or about September 16, 2026, the DoDIG issued a final closure of Dr. Williams' December 2025 complaint, stating the same rationale as the DHAIG discussed supra ¶¶ 113-115 (Ex. 63). Interestingly, the DoDIG conceded that at least one of Dr. Williams' claims was erroneously deemed untimely by the DHAIG in their June 8th response. Yet, the DoDIG still declined to address it as a key factor linked to previous retaliatory conduct.

## Other Attempts at Redress

119. Between 2023-26, Dr. Williams made several additional attempts at alerting the DoDIG of further reprisal conduct (Ex. 70-73). Specifically, he made disclosures addressing the pervasive nature of the retaliatory conduct that he was facing from command ***and*** other senior officials (e.g., Maj Gen Paul Moga, Lt Gen Derek France, Lt Gen John Lamontagne, and Dr. Gerald Curry of the Air Force Review Boards Agency (SAF/MRB)) assisting in reprisal from a distance. Among these disclosures, he included reports of senior officials making false statements under oath, dismissing claims of

retaliation and command misconduct in bad faith, and permitting illegal command action against an officer without the required due process.

120. For each claim, Dr. Williams provided extensive evidentiary support, including but not limited to texts, emails, official documentation, and audio recordings.

121. Yet, even with comprehensive evidentiary support, the DoDIG dismissed each case without investigation, despite the clear nexus between the additional claims and the original reprisal claims that were eventually substantiated in December 2025.

122. Dr. Williams further exhausted his administrative options by submitting appropriate and associated claims with the Office of Special Counsel (OSC), the Council of the Inspectors General on Integrity and Efficiency (CIGIE), The Joint Commission (TJC), the United States Department of Justice Civil Rights Division, and the Government Accountability Office (GAO). None of which provided appropriate remedy or an adequate manner of redress.

## CAUSES OF ACTION

### COUNT ONE
### Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (D)
(Arbitrary, Capricious, Abuse of Discretion, and Contrary to Law / Without Observance of Procedure Required by Law – Defendants DHA and DoD)

123. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

124. Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) and (D), a reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law.

125. On or about June 11, 2025, Defendant DHA issued a final agency action permanently revoking Dr. Williams' military medical credentials and subsequently submitting a derogatory report to the civilian National Practitioner Data Bank (NPDB) and state licensing boards.

126. This final decision and credential revocation by Defendant DHA was arbitrary, capricious, an abuse of discretion, and contrary to law because it directly relied upon and adopted the findings of a QAI and a PRHP that were initiated and conducted in bad faith as retaliatory mechanisms against Dr. Williams following his protected disclosures. The QAI and PRHP proceedings relied solely upon disciplinary documentation and allegations that had been expressly rescinded and acknowledged as unwarranted by Brig Gen Clark in July 2023. Moreover, the QAIO impermissibly altered and morphed the core factual allegations midway through the QAI process after interviewing Dr. Williams, without providing prior notice or an opportunity to respond. Additionally, the PRHP and the DHA failed to address or consider material, unrefuted evidence, including fabricated allegations of home invasion and safety risks manufactured by command leadership to justify enrollment in the IHPP prior to subsequent QAI/PRHP proceedings. The PRHP panel was then inherently biased and conflicted, as it was presided over by an officer directly subordinate to Col Fewell, despite him being a primary subject in an ongoing IG investigation. Further tainting the PRHP process, the panel chair allowed the proceedings to go forward despite the many allegations being heavily reliant on disposition testimony based on fabricated claims of violent behavior.

127. By adopting these flawed, retaliatory, and procedurally defective proceedings as the sole basis to permanently revoke Dr. Williams' credentials and file a derogatory report with

the NPDB, the DHA and DoD acted arbitrarily and capriciously in taking these final actions. The defendants similarly committed a clear abuse of discretion, and failed to observe procedures required by law under 5 U.S.C. § 706(2)(A) and (D).

**COUNT TWO**
**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (D)**
(Failure to Follow Governing Regulations – DoDi 7050.09, DoDD 7050.06, and 10 U.S.C. § 1034 – Defendants DoDIG and DHAIG)

128. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

129. Federal administrative law requires agencies to strictly adhere to their own published directives, instructions, and governing statutes. Department of Defense Directive (DoDD) 7050.06 and Department of Defense Instruction (DoDI) 7050.09 implement the Military Whistleblower Reprisal Protection Act (MWPA), 10 U.S.C. § 1034, establishing mandatory duties and procedures for the DoDIG and component IGs (including DHAIG) to thoroughly, impartially, and promptly investigate all personnel actions taken in reprisal for protected communications.

130. Defendants DoDIG and DHAIG violated these mandatory regulatory and statutory commands, acting arbitrarily, capriciously, and without observance of procedures required by law under 5 U.S.C. § 706(2)(A) and (D), by arbitrarily terminating the scope of their reprisal investigation after October 2023, thereby omitting all subsequent retaliatory personnel actions—including the retaliatory QAI, the retaliatory PRHP, the permanent revocation of clinical privileges, and the NPDB filing. This action was taken despite clear, timely, and repeated notice from Dr. Williams of ongoing retaliatory conduct throughout 2023, 2024, and 2025.

131. Additionally, the defendants arbitrarily omitted key named subjects of reprisal (including Maj Gen Paul Moga, Lt Gen Derek France, Lt Gen John Lamontagne, Brig Gen Tad Clark, and Dr. Gerald Curry of SAF/MRB) from investigative reports and findings, despite documented disclosures proving their involvement in retaliatory actions.

132. Moreover, the defendants further violated the mandatory regulatory and statutory commands stated supra ¶129, by improperly dismissing Dr. Williams' December 2025 complaints as "untimely" against the great weight of the objective record proving prior timely notifications of retaliatory conduct. Furthermore, defendants artificially segmented and isolated the retaliatory personnel actions and abuses of authority, despite each action being inextricably linked throughout an extended period of longstanding retaliation. In doing so, the defendants avoided conducting a comprehensive investigation into the clear causal chain leading from the moment of protected disclosures in 2023 to credential revocation and final derogatory action with the NPDB years later.

133. The failure of Defendants DoDIG and DHAIG to comply with DoDD 7050.06 and DoDI 7050.09 constitutes agency action that is arbitrary, capricious, an abuse of discretion, and contrary to law within the meaning of 5 U.S.C. § 706(2)(A) and (D).

## COUNT THREE
## Violations of the Administrative Procedure Act, 5 U.S.C. § 706(1)
## (Unlawfully Withheld or Unreasonably Delayed Agency Action – Defendants DoDIG, DHA, and DHAIG)

134. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

135. Under 5 U.S.C. § 706(1), a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." Pursuant to 10 U.S.C. § 1034, DoDD 7050.06, and DoDI 7050.09, Defendants DoDIG and DHAIG possess a non-discretionary statutory and

regulatory duty to investigate and adjudicate all credible allegations of military whistleblower reprisal and related personnel actions.

136. Defendants DoDIG and DHAIG unlawfully withheld and unreasonably delayed required agency action by refusing to investigate, adjudicate, or issue findings regarding the retaliatory personnel actions initiated against Dr. Williams after October 2023 (including the QAI, PRHP, credential revocation, and NPDB referral), as well as the retaliatory conduct of named members of senior leadership (including but not limited to Maj Gen Paul Moga, Lt Gen Derek France, Lt Gen John Lamontagne, Brig Gen Tad Clark, and Dr. Gerald Curry of SAF/MRB).

137. This complete failure to perform statutorily mandated oversight functions constitutes agency action unlawfully withheld and unreasonably delayed pursuant to 5 U.S.C. § 706(1).

## COUNT FOUR
## Fifth Amendment Due Process Clause Violations
(Procedural Due Process – Deprivation of Protected Property and Liberty Interests – All Defendants)

138. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

139. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government and its agencies from depriving any person of life, liberty, or property without due process of law.

140. Dr. Williams possesses constitutionally protected property interests in his active military medical credentials, clinical practice privileges, and professional standing, as well as protected liberty interests in his professional reputation and ability to pursue his chosen profession as a licensed clinical psychologist.

141. Defendants deprived Dr. Williams of these constitutionally protected property and liberty interests without due process of law by initiating an IHPP, QAI, and PRHP based on false, fabricated, and uninvestigated allegations of home invasion and mental instability, without providing notice or an opportunity to challenge the false premises. Additionally, Defendants subjected Dr. Williams to a QAI where the investigating officer substantively altered the charges midway through the proceeding after interviewing him. The investigating officer then reached a conclusion based on these altered charges, without giving Dr. Williams an opportunity to address them. This series of actions deprived Dr. Williams of notice and a meaningful opportunity to respond.

142. Moreover, the Defendants executed a PRHP before a panel chaired by an officer (Maj Tiffany Chance) directly subordinate to one of the primary subjects/initiators (Col Jeffrey Fewell) of adverse retaliatory action against Dr. Williams. In doing so, the defendants corrupted the PRHP proceeding, inevitably influencing the outcome far before a final action was taken. Proceedings such as these must be unbiased. Yet, Dr. Williams was robbed of his opportunity for an unbiased hearing due to the obvious conflict of interest established when Maj Chance was designated as panel chair.

143. Dr. Williams was further deprived of his due process rights when the defendants adjudicated his credentials based on rescinded disciplinary records and contradictory, false testimony (offered under oath by senior officers). Similarly, when the defendants permanently revoked his clinical privileges and issued a stigmatizing, permanent derogatory report to the civilian NPDB and state licensing board, they did so without a fair, impartial, and untainted administrative process.

144. As a direct and proximate result of Defendants' procedural due process violations, Dr. Williams has suffered severe and irreparable harm to his career, professional reputation, state licensure, and future employability.

## COUNT FIVE
## First Amendment Violations
### (Whistleblower Retaliation / Free Speech Deprivation – All Defendants)

145. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

146. Under the First Amendment to the United States Constitution, public employees and military service members retain the right to engage in protected speech regarding matters of public concern—including reporting patient safety risks, regulatory malfeasance, clinical ethics violations, as well as fraud, waste, and abuse—free from government retaliation.

147. Dr. Williams engaged in protected First Amendment speech when he disclosed patient safety concerns, regulatory noncompliance, and command misconduct to his chain of command, 31 FW/EO, 31 FW/IG, DoDIG inspectors during the UEI, and the DHAIG investigators.

148. Members of his chain of command took severe, adverse, and escalating retaliatory actions against Dr. Williams directly motivated by his protected speech. These actions included removing him from his FAO leadership position, issuing retaliatory disciplinary documentation, ordering an unwarranted CDE requesting a personality disorder diagnosis, sabotaging and delaying his humanitarian reassignment following diagnosis his mother's terminal cancer, placing him on no-contact orders and the IHPP based on

false allegations of violence, initiating a retaliatory QAI and PRHP, revoking his clinical privileges, and reporting him to the civilian NPDB.

149. Defendants' adverse actions in retaliation for Dr. Williams' protected communications would chill a person of ordinary firmness from continuing to engage in protected First Amendment speech. Thus, Defendants' retaliatory actions violated Dr. Williams' rights under the First Amendment to the United States Constitution.

## COUNT SIX
## Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
(Agency Action Contrary to Constitutional Right — First Amendment Whistleblower Retaliation — All Defendants)

150. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

151. The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), requires a reviewing court to hold unlawful and set aside any agency action, findings, and conclusions found to be "contrary to constitutional right, power, privilege, or immunity."

152. Sovereign immunity for this constitutional claim against federal agencies and federal officials acting in their official capacities is explicitly and unequivocally waived pursuant to 5 U.S.C. § 702, which permits judicial review of claims seeking relief other than money damages.

153. Under the First Amendment to the United States Constitution, public employees and military service members retain a protected right to engage in speech regarding matters of public concern—including reporting systemic patient safety risks, regulatory noncompliance, clinical ethics violations, and command malfeasance—free from government retaliation or restriction.

154. Dr. Williams engaged in speech clearly protected by the First Amendment when he disclosed severe patient safety risks, historical regulatory noncompliance, and command conflicts of interest to his chain of command, 31 FW/EO, 31 FW/IG, DoDIG inspectors during a scheduled Unit Effectiveness Inspection, and DHAIG investigators.

155. The Defendants' subsequent final actions—including the permanent revocation of Dr. Williams' military medical credentials by the DHA on June 11, 2025, the filing of a stigmatizing derogatory report in the civilian National Practitioner Data Bank (NPDB), and the arbitrary closure of the underlying reprisal investigations by the DoDIG and DHAIG—were directly, causally, and demonstrably motivated by animus against Dr. Williams' protected speech.

156. These adverse and escalating personnel actions were executed in bad faith using fabricated allegations of mental instability and home invasion as a post-hoc rationalization to chill, penalize, and silence Dr. Williams' whistleblowing activities.

157. Because the Defendants' final administrative actions directly penalize and retaliate against Dr. Williams for exercising his protected right to free speech on matters of vital public concern, the final agency actions are unconstitutional, contrary to constitutional right under the First Amendment, and must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(B).

## COUNT SEVEN

## Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)

(Agency Action Contrary to Constitutional Right — Fifth Amendment Procedural Due Process — All Defendants)

158. Plaintiff realleges and incorporates all preceding paragraphs by reference as though fully set forth herein.

159. Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(B), a reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be "contrary to constitutional right, power, privilege, or immunity".

160. Pursuant to 5 U.S.C. § 702, the United States has expressly waived sovereign immunity for constitutional claims against federal agencies and federal officers acting in their official capacities where the plaintiff seeks relief other than money damages.

161. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government and its administrative agencies from depriving any person of life, liberty, or property without due process of law.

162. Dr. Williams possesses constitutionally protected property interests in his active military medical credentials, clinical practice privileges, and professional standing, as well as protected liberty interests in his professional reputation and his ability to pursue his chosen career as a licensed clinical psychologist.

163. The Defendants directly deprived Dr. Williams of these constitutionally protected property and liberty interests without due process of law by initiating an Impaired Health Provider Program (IHPP), a Quality Assurance Investigation (QAI), and a Peer Review Hearing Panel (PRHP) based on false, fabricated, and uninvestigated allegations of home invasion and mental instability, completely denying him notice or a meaningful opportunity to challenge the false premises.

164. The Defendants further corrupted Dr. Williams' procedural due process rights during the QAI when the investigating officer substantively altered and morphed the core factual charges midway through the proceeding after interviewing him, reaching an adverse

conclusion without providing Dr. Williams notice or an opportunity to respond to the revised charges.

165. The Defendants fundamentally tainted the administrative process by executing a PRHP before a panel chaired by an officer (Maj Tiffany Chance) who was directly subordinate to one of the primary targets and initiators of the underlying adverse actions (Col Jeffrey Fewell), creating an impermissible conflict of interest that destroyed the requisite impartiality of the tribunal.

166. By permanently revoking Dr. Williams' clinical privileges based on rescinded disciplinary records, conflicting and false testimony offered under oath by senior officers, and tainted administrative tribunals, and by subsequently issuing a permanent, career-ending derogatory report to the civilian National Practitioner Data Bank (NPDB), the Defendants executed a final agency action that violated the core tenets of procedural due process.

167. Because the Defendants' final administrative actions permanently stripped Dr. Williams of his credentials and ruined his professional standing through a process devoid of standard procedural safeguards, the final agency actions are unconstitutional, contrary to constitutional right under the Fifth Amendment, and must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Deonte Williams, respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, granting the following relief:

**Declaratory Judgment:**

A. Declare that Defendant DHA's final agency decision of June 11, 2025, revoking Dr. Williams' military medical credentials and reporting him to the National Practitioner Data Bank (NPDB), was arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of procedure required by law under 5 U.S.C. § 706(2)(A) and (D).

B. Declare that Defendants DoDIG and DHAIG violated 10 U.S.C. § 1034, DoDD 7050.06, and DoDI 7050.09 by failing to investigate and adjudicate all retaliatory personnel actions initiated against Dr. Williams after October 2023.

C. Declare that Defendants violated Dr. Williams' constitutional rights to Procedural Due Process under the Fifth Amendment and Free Speech under the First Amendment.

D. Declare that Defendants violated Dr. Williams' constitutional rights, rendering the final agency actions unlawful under 5 U.S.C. § 706(2)(B).

E. Declare that Defendants violated Dr. Williams' constitutional rights to Procedural Due Process, rendering the final agency actions reviewable and unlawful under 5 U.S.C. § 706(2)(B).

**Vacatur and Set Aside:**

F. Vacate and set aside in its entirety Defendant DHA's June 11, 2025 final action revoking Dr. Williams' clinical credentials.

G. Vacate and set aside all underlying QAI and PRHP findings, determinations, and recommendations generated by the 31 MDG and DHA.

H. Vacate and set aside the June 8, 2026 and September 16, 2026 final closure decisions issued by DHAIG and DoDIG.

**Injunctive Relief:**

I. Direct and compel Defendant DHA to immediately recall, withdraw, and permanently expunge all derogatory reports, notifications, and filings submitted regarding Dr. Williams to the National Practitioner Data Bank (NPDB), state medical/psychology licensing boards, and any other healthcare reporting repositories.

J. Direct and compel Defendants to expunge and remove all retaliatory documentation, CDE references, IHPP records, QAI materials, PRHP records, and adverse credentialing determinations from Dr. Williams' military personnel, medical, and credentialing files.

K. Direct and compel Defendants DoDIG and DHAIG to reopen, fully investigate, and properly adjudicate all claims of whistleblower reprisal and adverse personnel actions occurring after (or incident to) October 2023, including the retaliatory conduct of all named senior officers, in full compliance with 10 U.S.C. § 1034, DoDD 7050.06, and DoDI 7050.09.

**Remand and Retention of Jurisdiction:**

L. Remand this matter to the Department of Defense and Defense Health Agency for processing consistent with governing law and the Court's judgment.

M. Retain jurisdiction over this action to ensure full, prompt, and complete compliance with the Court's orders and judgments on remand.

**Costs and Attorney Fees:**

N. Award Plaintiff reasonable attorneys' fees, costs, and expenses incurred in bringing this action pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, or other applicable law.

O. **Other Relief:**

P. Grant such other, further, and additional non-monetary relief as the Court deems just, equitable, and proper.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: 10/15/2026

Respectfully Submitted,

/s/ Deonte Williams

**Deonte Williams**
1804 Hawlings Park Ct
Brookeville, MD 20833
Phone: (240) 541-0529
Email: drdeontewilliams@gmail.com
*Plaintiff Pro Se*